## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| **ABDELHALEEM ASHQAR,** | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )      **Case No. 1:19-cv-716** |
| | ) |
| **RUSSELL HOTT, et al.,** | ) |
| **Respondents.** | ) |
| | ) |

## ORDER

At issue on an emergency application for a temporary restraining order ("TRO Motion") is whether the Court may stop or bar removal of petitioner Abdelhaleem Ashqar to Jordan and stay the removal proceeding so that petitioner may pursue *habeas corpus* proceedings and appeal the denial of his motion to reopen his removal proceedings before the Board of Immigration Appeals ("BIA"). The TRO Motion was filed at approximately 6:30 p.m. on June 4, 2019. At 10 p.m. that same day, the Court held an emergency telephonic hearing with counsel for petitioner and counsel for the government. This hearing lasted for more than two hours, and counsel for the parties were given ample opportunity to argue the matter. At the conclusion of the hearing, the matter was taken under advisement, but counsel for the government was directed to advise respondents that they were not to deliver petitioner to Israeli authorities. In other words, respondents were directed to maintain petitioner in U.S. custody until the issuance of a decision in this case on June 5, 2019. Specifically, respondents were directed not deliver petitioner to the custody of any Israeli officials.

The threshold questions presented by petitioner's application are the following: (1) whether 8 U.S.C. § 1252(g) provides a jurisdictional bar to consideration of the requested relief and (2) if so, whether the application of § 1252(g) violates the Suspension Clause of the Constitution. Because § 1252(g) bars jurisdiction and because the Suspension Clause is not implicated, petitioner's motion must be denied.

1

The following facts are derived from the petition's allegations and the government's response.[1]

1. Petitioner is a 60-year old Palestinian born on the West Bank when it was under Jordanian control.

2. The West Bank later came under Israeli control. In 1981, petitioner protested what he viewed as Israeli occupation of the West Bank and Israeli security forces imprisoned him, beat him, interrogated him, and denied him medical care.

3. After his release, petitioner pursued his education. In 1989, petitioner received a Fulbright scholarship to attend the University of Mississippi on a J-1 exchange visitor visa and he did so.

4. In 1998, petitioner was served with a subpoena to appear and testify before a grand jury in the Southern District of New York. In that event, Petitioner refused to testify and was therefore held in civil contempt and incarcerated for six months.

5. Upon his release from incarceration, petitioner filed a Form I-589, Application for Asylum and for Withholding of Removal.

6. In 1999, the Immigration and Naturalization Service ("INS") issued petitioner a Notice to Appear for removal proceedings.

7. Petitioner later withdrew his application for asylum and on June 13, 2003, petitioner entered into an agreement with the government for the entry of a stipulated order of removal removing petitioner to Jordan. The stipulated order of removal was entered in

---

[1] For purposes of deciding the threshold jurisdictional question the facts alleged in the petition are assumed to be true. In this regard it is important to note that petitioner's allegation that he was previously tortured by Israeli officials and therefore has a bona fide fear of being tortured if he is delivered to Israeli officials it is unnecessary to reach or decide the truth of this allegation.

Arlington, Virginia on June 16, 2003 and has become final.

8. On June 25, 2003, petitioner was issued a subpoena to testify before a grand jury in the Northern District of Illinois. Petitioner again refused to testify and once again petitioner was held in civil contempt.

9. Thereafter, Petitioner was indicted for criminal contempt based on his refusal to testify in the Northern District of Illinois. *See United States v. Ashqar*, No. 1:03-cr-00978-3 (N.D. Ill.), Indictment.

10. In August 2004, petitioner was indicted for RICO conspiracy, criminal contempt, and obstruction of justice. *See id.*, Superseding Indictment.

11. From July 2004 to November 2007, petitioner was under house arrest.

12. On November 21, 2007, after a jury trial on the superseding indictment, petitioner was convicted of criminal contempt and obstruction of justice and acquitted of the RICO conspiracy charge. As a result, Petitioner was sentenced to a period of 135 months for criminal contempt and 120 months for obstruction. These sentences were to run concurrently with one another. *See United States v. Ashqar*, No. 1:03-cr-00978-3 (N.D. Ill.), Judgment in a Criminal Case.

13. After petitioner served his custody sentence (135 months) on June 13, 2017, he was immediately transferred to ICE custody.

14. On May 17, 2018, petitioner filed a writ of *habeas corpus* challenging his indefinite detention. As a result, petitioner was released from custody on December 18, 2018, and since that date, has been residing with his family in Northern Virginia.

15. On May 24, 2018, petitioner filed a motion to reopen his removal proceedings with the Arlington Immigration Court, based on his fear that he would be tortured by the Israeli government if he were removed to Jordan.

16. On July 25, 2018, the Immigration Court denied petitioner's motion to reopen his removal proceeding. Petitioner timely appealed this ruling to the BIA.

17. Then, on April 17, 2019, petitioner underwent knee replacement surgery.

18. On May 18, 2019, petitioner received a letter asking him to report for immigration proceedings on June 4, 2019. Petitioner's counsel requested that this reporting date be postponed given petitioner's surgery and the fact that the date fell during Ramadan and Eid al-Fitr. In response, on May 29, 2019, the government's agents falsely represented to petitioner and his counsel that petitioner would be issued an order of supervision at his next appointment and requested additional documentation regarding the knee surgery.[2]

19. On June 4, 2019, petitioner reported to ICE as requested. Petitioner's counsel did not accompany him on the basis of respondent's false representation that petitioner would only be issued an order of supervision.

20. At 10:55 a.m., petitioner's family informed petitioner's counsel that, in fact, petitioner had been detained by ICE and placed in restraints. Petitioner's counsel called the government's agents who once again falsely represented to petitioner's counsel that petitioner was merely being taken to a secure area for fingerprinting. In fact, respondents then placed petitioner on a chartered aircraft and removed him from the United States.

21. At 12:45 p.m., petitioner's counsel learned that petitioner was on an aircraft destined for Israel.

22. At 2:30 p.m. petitioner's counsel filed an emergency motion to stay with BIA. Shortly thereafter, petitioner's counsel was informed that petitioner had already been removed and that BIA would not adjudicate the motion.

---

[2] Indeed, at this time, it appears that respondents had already decided and planned to remove petitioner, but did not advise the petitioner of this fact.

23. Petitioner's counsel then filed in this Court the petition for writ of *habeas corpus* and this TRO Motion at 6:30 p.m. after the closing of the Court.

24. Thereafter, upon being advised of this filing, the Court convened an emergency telephonic hearing with petitioner's counsel and the government's counsel at 10 p.m. on June 4, 2019.

25. In the course of the hearing, counsel for respondents advised the Court that the government-chartered aircraft transporting petitioner would be landing in Vienna for refueling. The Court asked whether that aircraft could remain in Vienna while the matter was being heard, but counsel then advised the Court that the chartered aircraft had left Vienna and was on its way to Israel.

26. Following oral argument, the Court took the matter under advisement and provided the parties with an opportunity to supply additional briefing by 11:00 a.m. on June 5, 2019.

27. The Court indicated that it would rule on this jurisdictional dispute promptly, on June 5, but directed respondents, in the interim, not to turn over petitioner to Israeli officials until the Court had decided the issues before it.

28. Counsel for respondent represented that respondents would comply with this direction.

29. Respondents assert in their opposition brief that, at this time, petitioner remains in U.S. custody in Israel.

## II.

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 8 U.S.C. § 1252, *et seq.*, ("IIRIRA"), Congress clearly and explicitly limited judicial review of immigration cases involving orders of removal. Specifically, § 1252(g) provides as follows:

> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear *any cause or claim* by or on behalf of any alien arising from the decision or action by the Attorney General to *commence* proceedings, *adjudicate* cases, or *execute* removal orders against any alien under this chapter.

8 U.S.C. § 1252(g) (emphasis added). Thus, Congress has made clear that federal courts have no jurisdiction over any claim or cause arising from the Attorney General's decision in commencing proceedings, adjudicating cases, or executing removal orders. Underscoring this removal of jurisdiction, the Supreme Court, in 1999, clarified the scope of § 1252(g), holding that § 1252(g) applied "only to three discrete actions that the Attorney General may take" the decision – namely, to: (1) commence proceedings; (2) adjudicate cases; or (3) execute removal orders. *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 481 (1999) ("*AAADC*"). The Supreme Court reasoned that these three actions are stages of the removal process where the Executive branch has discretion and Congress withdrew federal jurisdiction over such decisions as a means of streamlining the removal process. *See id.* at 483-85. Following the Supreme Court's *AAADC* decision, the Fourth Circuit, in *Mapoy v. Carroll*, 185 F.3d 224 (4th Cir. 1999), further made unmistakably clear that "Congress could not have been more clear and unequivocal that the courts shall not have subject matter jurisdiction over claims arising from the actions of the Attorney General enumerated in § 1252(g)." *Id.* at 230.

Here, § 1252(g) is controlling. This is so because the TRO Motion seeks to "prohibit Respondents from removing Petitioner until his appeal of his motion to reopen has been adjudicated." In other words, petitioner seeks review of the execution of a removal order by the Attorney General. Thus, petitioner's request falls squarely within the terms of § 1252(g). Accordingly, that provision bars jurisdiction in this case.

Cases within this circuit provide ample authority confirming this result. In *Mapoy v. Carroll*, the Fourth Circuit, in a case involving similar facts, reached the conclusion that there was no jurisdiction to review a removal order. *See* 185 F.3d at 226. There, an alien voluntarily agreed to departure, but then filed a motion to reopen his deportation proceedings and also filed an appeal of his motion to reopen at the same time that he filed a petition in federal court. *Id.* In

6

vacating the district court's grant of a stay, the Fourth Circuit held that the district court "could not assert jurisdiction over Mapoy's claim challenging BIA's execution of an order of deportation," because his claim "clearly arose from the INS's decision to execute a removal order and is subject to § 1252(g)." *Id.* 228-29.

Understandably, district courts within this circuit have followed *Mapoy*. *See Nunez-Garcia v. United States*, 364 F. Supp. 3d 620, 624-25 (W.D. Va. 2019) (holding that courts in the Fourth Circuit have recognized that district courts do not have jurisdiction to stay any order of deportation); *Hutton v. West Virginia*, No. 13-cv-186, 2014 WL 856489, at *7, n. 10 (N.D. W.Va. Mar. 5, 2014) ("[T]his Court lacks jurisdiction to grant petitioner's request for an order staying his pending removal proceedings."); *Tobar-Barrera v. Napolitano*, No. 09-cv-3064, 2010 WL 972557, at *2 (D. Md. Mar. 12, 2010) ("[T]his Court is not authorized to enjoin the removal proceedings currently pending before the Immigration Court."); *Hatami v. Ridge*, 270 F. Supp. 2d 763, 766-67 (E.D. Va. 2003)(Ellis, J.) ("§ 1252(g) operates in this context to preclude consideration of plaintiff's request for a temporary stay barring his removal to Afghanistan").

In sum, settled authority in this circuit makes clear that there is no jurisdiction to adjudicate petitioner's emergency application for a temporary restraining order. Nor do the many cases cited by petitioner require a different result; those decisions, which have now been reviewed, are either readily distinguishable, not controlling, or not persuasive. In *Bowrin v. INS*, 194 F.3d 483 (4th Cir. 1999), the Fourth Circuit found that "agency interpretations of statutes" do not "fall into any of the three categories enumerated in § 1252(g)." *Id.* at 488. But, petitioner does not point to any agency interpretation of a statute that he challenges in his *habeas* petition. Rather, petitioner asserts that *Bowrin* provides jurisdiction over his challenge to the Attorney General's authority to exercise his discretion – or in other words remove him – while he has a pending motion to reopen. Not so. *Bowrin* does not address that question, but *Mapoy* does and it

7

is controlling here. The district court cases cited by petitioner also do not alter this analysis or take into account the weight of authority in *this* circuit. These cases are not persuasive because they engage in the fiction that petitioners are not challenging the execution of their removal orders by seeking to stay the removal order. *See De Jesus Martinez v. Neilsen*, 341 F. Supp. 3d 400, 407 (D.N.J. Sept. 14, 2018); *Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1150 (C.D. Cal. Jan. 25, 2019); *Calderon v. Sessions*, 330 F.3d 944, 950 (S.D.N.Y. 2018).[3]

The conclusion that § 1252(g) strips federal courts of jurisdiction does not end the analysis, because petitioner has also asserted a separate constitutional claim. Specifically, petitioner argues that if § 1252(g) applies, then the statute is unconstitutional as applied to him because it violates the Suspension Clause. This argument is similarly unavailing because the Suspension Clause is not implicated by the facts of this case and because Congress has provided adequate substitutes for *habeas corpus* petitions in these circumstances.

The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended." U.S. Const. art. I, § 9, cl. 2. Petitioner's argument that he is effectively denied *habeas corpus* relief is incorrect. To begin with, petitioner is not seeking *habeas* relief under § 2241, but instead seeking a stay of the removal order.[4] As the Sixth Circuit found in *Hamama v. Adducci*, 912 F.3d 869 (6th Cir. 2018), the relief requested there – "a stay of removal

---

[3] Petitioner also cites the Supreme Court's decisions in *AAADC* and *Jennings v. Rodriguez*, 138 S.Ct. 830 (2018) for the general propositions that § 1252(g) should be narrowly construed and not "sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General." *Jennings*, 138 S.Ct. at 841. The result reached here is consistent with *Jennings* and related cases, as petitioner here directly challenges the execution of his Removal Order and seeks to stay its execution.

[4] The Fourth Circuit did not reach the constitutional question in *Mapoy*, finding instead that Mapoy was a "non-criminal alien who received judicial review of his challenge to the final order of deportation against him." *Mapoy*, 185 F.3d at 230, n. 7. Unlike petitioner, Mapoy had filed a petition for review of his departure order with the Ninth Circuit, which was rejected. *See id.* at 226.

[ – would] not result in Petitioners' release from custody." *Id.* at 875. Accordingly, the Suspension Clause was not implicated in *Hamama*. *See id.* (holding that, because petitioner's "removal-based claims fail to seek relief that is traditionally cognizable in habeas, the Suspension Clause is not triggered"); *see also Hatami*, 270 F. Supp. 2d at 768 ("[I]t is § 1252(g) that is implicated, *not* the Suspension Clause." (emphasis in original)). Similarly here, the Suspension Clause is not implicated because petitioner does not seek to be released from custody, but to enjoin his removal from the United States.[5]

Additionally, even if the Suspension Clause were implicated, Congress nonetheless provides adequate substitutes for *habeas corpus* thereby not offending the Suspension Clause. *See Swain v. Pressley*, 430 U.S. 372, 381 (1977) ("the substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention" does not violate the Suspension Clause). Congress has done so here and petitioner has other avenues available to him to challenge his removal. Specifically, petitioner may continue to pursue from abroad an appeal of the Immigration Court's denial of his motion to reopen. *See Canda*, 912 F.3d at 876 ("When Congress stripped the courts of jurisdiction to grant habeas relief in § 1252(g), it provided aliens with an alternative method to challenge the legality of removal orders: a motion to reopen followed by a petition for review filed in a court of appeals."); *Iasu v. Smith*, 511 F.3d 881, 893 (9th Cir. 2007) ("A potential motion to reopen can suffice to alleviate Suspension Clause concerns."); *Alexandre v. U.S. Attorney General*, 452 F.3d 1204, 1206 (11th Cir. 2006) (finding no Suspension Clause concern where "a deportable alien can still seek review of

---

[5] Petitioner specifically requests that the Court: (1) assume jurisdiction over this matter; (2) enjoin respondents from transferring petitioner to the custody of the Israeli government; (3) order respondents to immediately return petitioner to the United States; (4) enjoin respondents from removing petitioner from the United States until he has received a decision on the pending appeal of his motion to reopen the removal proceeding; and (5) award petitioner his costs and reasonable attorneys' fees.

constitutional and legal claims by moving the BIA to reopen or reconsider its previous ruling");

*Benitez-Garay v. Dept. of Homeland Security*, No. 18-ca-422, 2019 WL 542035, at *8 (W.D.

Tex. Feb. 8, 2019) (finding no Suspension Clause issue where the petitioner had filed a motion to

reopen). That petitioner will be located outside of the United States at the time he challenges his

removal is of no legal consequence. The Fourth Circuit has held that a petitioner need not be in

the United States to continue to challenge the denial of his motion to reopen removal

proceedings. *See William v. Gonzales*, 499 F.3d 329, 334 (4th Cir. 2007) ("We find that §

1229a(c)(7)(A) unambiguously provides an alien with the right to file one motion to reopen,

regardless of whether he is within or without the country."); *see also Lisboa v. Holder*, 436 F.

App'x 545, (11th Cir. 2011) ("'[T]he BIA cannot disclaim jurisdiction on the ground that the

alien is outside the United States.").

Although there is no jurisdiction in this case, there is some concern that the Attorney

General or his ICE agents may not be executing the Removal Order in accordance with its

specific terms. The Final Order of Removal provides that: "it is hereby **ORDERED** that the

respondent be removed from the United States to Jordan." Accordingly, the Court will maintain

jurisdiction of this case to ensure that respondents are complying with the Removal Order and

the Court's order of this date prohibiting respondents from delivering petitioner to the Israelis.

Accordingly, government's counsel and the agents who actually executed the Removal Order

must file affidavits in this case stating, under penalty of perjury, whether they adhered to the

Removal Order by delivering petitioner to Jordan and that they did not turn petitioner over to any

entity or person associated with the Israeli government.

Accordingly,

It is hereby **ORDERED** that petitioner's emergency motion for a temporary restraining

order (Dkt. 2) is **DENIED**.

It is hereby further **ORDERED** that respondents' counsel and the agents who executed petitioner's Removal Order shall file, by **June 14, 2019 at 5 p.m.**, affidavits in this case stating whether they complied with the Removal Order by delivering petitioner to Jordan and whether they complied this Court's oral Order and the instant Order prohibiting respondents from turning petitioner over to any Israeli officials.[6]

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, Virginia
June 5, 2019

T. S. Ellis, III
United States District Judge

---

[6] It bears repeating that this Court's Order directing respondents not turn petitioner over to any Israeli officials must not be construed in any way as accepting as true petitioner's claim that he was tortured by Israeli officials in the past and that he has a bona fide fear that he will be tortured by Israeli officials if he is turned over to them. Rather, this Order merely seeks to ensure that there is strict compliance with the Removal Order.